UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 6: 13-010-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| LESLIE MONROE, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

This matter is pending for a determination of Defendant Leslie Monroe's competency to stand trial. For the reasons discussed below, the Court concludes that Monroe is competent for trial purposes.

# I.

On September 10, 2013, this matter came before the undersigned for a hearing regarding the issue of Defendant Leslie Monroe's competency pursuant to 18 U.S.C. §§ 4241, 4242(a), and 4247(c) & (d). On May 10, 2013, the defendant filed a motion for an examination to determine his competency to stand trial and his sanity at the time of the alleged offense. [Record No. 18] The government did not oppose the defendant's request. [Record No. 20]

On May 14, 2013, the Court granted the defendant's motion. [Record No. 22] Monroe was ordered to report to the custody of the Attorney General, or his authorized

representative, for the placement in an institution designated by the Bureau of Prisons ("BOP"), where a complete psychological and psychiatric study could be made in accordance with 18 U.S.C. § 4247(b). [Record No. 22] Thereafter, on May 20, 2013, the defendant self-reported to the Federal Medical Center in Lexington, Kentucky, ("FMC-Lexington") to begin his period of evaluation. The defendant was examined at FMC-Lexington from May 20, 2013, through August 2, 2013.[1] [Record No. 33] Following this custodial evaluation, two separate forensic reports were issued due to the distinct nature of the questions raised regarding the defendant's psychological functioning. [*See id.*] Specifically, the competency evaluation concerns the defendant's current mental state ("Competency Report"), while the criminal responsibility examination concerns the defendant's mental status only at the time of the alleged offense ("Sanity Report"). All parties had access to the resulting forensic reports issued by clinical psychologist Dr. Dia B. Boutwell, Ph.D. In the reports, Dr. Boutwell concluded that the defendant was both competent for trial purposes and that he was able to appreciate the nature, quality, and wrongfulness of his behavior at the time of his alleged offense. [*Id.*, pp. 13, 19]

After receiving Dr. Boutwell's reports, the Court held a competency hearing on September 10, 2013, during which Assistant United States Attorney ("AUSA") David Marye appeared on behalf of the United States, as well as Monroe and his court-appointed attorney Andrew M. Stephens. [*See* Record No. 37.] At the hearing, Dr. Boutwell testified

---

1   On June 12, 2013, the Court ordered that Monroe's period of evaluation be extended until August 2, 2013. [Record No. 25]

consistently with the findings in her report. Although the defendant contested the findings, no other evidence was presented. Nonetheless, the Court granted the defendant's oral motion to generally continue the matter pending notification by the defendant of his intent to present any additional proof or call other witnesses. [*See* Record No. 37.]

Monroe subsequently filed a psychological evaluation undertaken in connection with a previous Social Security claim resulting from an alleged mental disability from February 24, 2006. [Record No. 40] Additionally, on October 30, 2013, he filed various medical records and mental health assessment reports from the Cumberland River Comprehensive Care Center ("Cumberland CompCare"). [Record No. 43] Monroe also indicated that he was scheduled to be reevaluated on November 11, 2013, at Cumberland CompCare for a clinical assessment of competency. [Record No. 43] As a result, he again requested an extension of time to submit the results of his reevaluation or to request a hearing. [*Id.*] On November 7, 2013, the Court granted the defendant's motion and extended the deadline until November 29, 2013, to allow the defendant to file a notice of his intentions to submit additional evidence on the issue of his competency (or request a hearing). [Record No. 46]

Despite the Court's extension, Monroe failed to file the results of his competency evaluation from Cumberland CompCare or to request a hearing. As a result, on January 31, 2014, the Court notified the parties that the issue of the defendant's competency stood submitted for review. [Record No. 47]

## II.

Section 4241 of Title 18 of the United States Code codifies the competency principles of *Dusky v. United States*, 362 U.S. 402 (1960). To be competent, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as a factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402; *see also* 18 U.S.C. § 4241(a) (phrasing the test as whether a defendant is "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense"); *United States v. Nichols*, 56 F.3d 403, 410 (2nd Cir. 1995) (applying the "two-prong" competency test from *Dusky*). Section 4247(d) governs the competency hearing, and assures certain trial-type rights. These include the right to confront and cross-examine witnesses, and the right to participate in the hearing. *See id.*; *see also* 18 U.S.C. § 4241(c) (referring to the hearing procedures outlined in § 4247(d)).

Ultimately, under § 4241(d), a defendant is not competent if, "after the hearing, the court finds by a preponderance of the evidence that the defendant" meets the incompetency definition of § 4241(a). This framework does not dictate which party bears the burden, which has led to disagreement among the Circuits. *Compare United States v. Teague*, 956 F.2d 1427, 1431 n.10 (7th Cir. 1992); *United States v. Frank*, 956 F.2d 872, 875 (9th Cir. 1991); *Brown v. Warden, Great Meadow Corr. Facility*, 682 F.2d 348, 352 (2nd Cir. 1982); and *United States v. Makris*, 535 F.2d 899, 906 (5th Cir. 1976) ("There can be no question that in federal criminal cases the government has the burden of proving defendant competent to stand trial at the § 4244 hearing . . . ."), *with United States v. Robinson*, 404 F.3d 850, 856

(4th Cir. 2005) ("Under federal law the defendant has the burden, by a preponderance of the evidence [to show] that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense") (internal quotation marks omitted); *United States v. Izquierdo*, 448 F.3d 1269, 1276 (11th Cir. 2006) ("[T]he relevant competency statute arguably contemplates that the burden will lie with the party making a motion to determine competency."); *United States v. Simmons*, 993 F. Supp. 168, 170 (W.D.N.Y. 1998) ("The burden to prove a lack of competence is on the defendant.").

The issue of burden allocation only matters when it is the deciding factor. *See, e.g., Medina v. California*, 505 U.S. 437, 449 (1992) (indicating that argument over burden, in competency context, only matters in "narrow class" of cases where the proof is "in equipoise"). Here, because the record overwhelming supports a finding of competency, the burden allocation issue need not be resolved by the Court.

### III.

#### A. Dr. Boutwell's Competency Report and Testimony

The only proof presented during the competency hearing regarding Monroe's current competency was the expert analysis of Dr. Boutwell, as set out in the Competency Report and further explained through her testimony. Dr. Boutwell throughly analyzed Monroe's history, behavior, the course of his evaluation, and testing performance. She directly observed Monroe through interviews and subjected him to a litany of psychological tests.

Dr. Boutwell also obtained supplemental and collateral information to aide in her evaluation.[2] She obtained information from a number of other sources, including the attorneys in the case and the defendant's x-wife Vickie Mills, as well as information obtained from a review of the defendant's recorded phone calls while at FMC-Lexington. [*See* Record No. 33, pp. 3-4, 8-10.]

The Competency Report is a comprehensive assessment of Monroe's mental and psychiatric condition and circumstances. The defendant was evaluated at FMC-Lexington over a period of seventy-four days. Once he arrived at FMC-Lexington, Monroe underwent a routine physical examination. He was also asked to complete a personal history questionnaire and answer a series of competency-related questions.[3] Based on his responses, Monroe was not viewed as a reliable historian. On numerous occasions, the defendant stated that he was unable to recall even basic personal information, such as his level of education, the names of his parents, who raised him as a child, or prior treatment for mental health issues. Additionally, Monroe provided conflicting information regarding his marital status. At first, Monroe denying he was married, but when later asked specific questions regarding his marriage to Mills, he acknowledged the marriage. Dr. Boutwell testified and reported that this type of exchange was characteristic of her interactions with the defendant.

---

2    At the competency hearing, Dr. Boutwell was properly qualified to testify and the Competency Report and Sanity Report were subsequently admitted into evidence.

3    Because of his illiteracy, these questions were discussed during a series of clinical interviews.

Dr. Boutwell indicated that Monroe did not appear to be suffering from acute stress at the time he arrived at the facility. While at FMC-Lexington, he was placed in an unlocked room in the general population. Monroe successfully completed the Admission and Orientation program and was provided rules and regulations for the facility. Monroe understood these procedures as they were explained. He also set-up his telephone and commissary services without issue. Notably, despite his claims of not remembering basic personal information when answering series of personal history and competency-related questions, Monroe was able to provide personal information required for completing his telephone and commissary forms. Specifically, he was capable of recalling from memory telephone numbers. He also obtained commissary on a weekly basis without difficulty or confusion. [Record No. 33, pp. 5-6]

Further, Monroe displayed no problems understanding or following the direction of correctional staff, comprehending unit rules, keeping and attending scheduled appointments, or complying with routine demands of the his environment. Again, Dr. Boutwell noted the incongruous nature of Monroe's self-reported predominant and extensive memory loss compared to his ability to independently carry out all daily activities on the unit. He had no issues with personal hygiene or room sanitation. Likewise, he regularly attended meals in the dining hall, participated in recreational activities, navigated the rather complex institution without assistance, and interacted appropriately with others. When dealing with the medical staff at the facility, Monroe was able to advocate for his needs and attended sick call under his own cognizance. During each of his several encounters with health services, he had no

difficulty recalling the details of his medical history and his thought processes were described as "logical, goal-directed, and coherent." [*Id.*, p. 6] In short, despite Monroe's reports to the contrary, he demonstrated no functional impairments over the course of his evaluation and there was no indication of any cognitive deficits.

Monroe was administered numerous psychological tests, including the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"); Minnesota Multiphasic Personality Inventory, 2nd Edition, Restructured Form ("MMPI-2-RF"); Validity Indicator Profile ("VIP"); and the Test for Memory Malingering ("TOMM"). [*See id.*, pp. 6-8.] The results of these tests were in conformity with numerous inconsistencies of Monroe's self-reported symptoms contrasted to his evaluation course and behavioral observations of his evaluators. As reported and testified to by Dr. Boutwell, the psychological testing only confirmed the defendant's poor effort and outright feigning of cognitive and psychiatric symptoms.

Specifically, the WAIS-IV and MMPI-2-RF results were found to be not credible due to the extreme degree of over-reporting of psychiatric symptoms by Monroe. Dr. Boutwell reported that the defendant appeared to intentionally respond incorrectly to questions. Dr. Boutwell also found that Monroe "endorsed a significantly large number of symptoms rarely reported even by individuals with sever psychopathology . . . and engaged in significant over-reporting of somatic complaints [that are] rarely reported by individuals with genuine medical conditions." [*Id.*, p. 7] Dr. Boutwell found that the combination of symptoms reported by Monroe "was simply not credible." [*Id.*]

Because of the pervasive nature of the defendant's believed over-reporting of symptoms, Monroe was administered the VIP and TOMM tests which are designed to measure and provide information about a examinee's approach and effort to psychological testing. [*Id.*, pp. 7-9] The results of these tests conformed with results of the previous tests and observations, indicating that the defendant was most likely deliberately intending to misrepresent himself as more impaired than his actual condition. Dr. Boutwell found that Monroe's response style to these tests could "represent a sophisticated attempt to feign or exaggerate cognitive deficits. [*Id.*, p. 8] Further, his TOMM results contradicted the manner in which human memory functions and suggested that he knew the correct answers but deliberately chose the incorrect answer in order to appear impaired. [*Id.*]

Dr. Boutwell's report, along with her testimony, set out in detail the inconsistent nature of Monroe's testing results, as well as his over-reporting and feigning of symptoms. These conclusions were further bolstered by a review of the defendant's recorded telephone calls to Mills, whom he spoke to one or two times daily throughout the evaluation period. During these conversations, Monroe provided Mills with detailed accounts of daily activities, including other inmates cases and bids for social security benefits. He detailed his daily interactions with evaluators and other inmates. Notably, on one occasion, he described how many of the inmates at the facility are involved in theft and that, when he first arrived, he "tested" other inmates by laying down less valuable items such as pens and pencils to assess whether he could leave more valuable items unsecured. Dr. Boutwell noted the sophistication of such actions. In short, Dr. Boutwell concluded that at all times during his

conversations, the defendant appeared "lucid, rational, and goal-directed," and in no way appeared to suffer from psychiatric symptoms or to suffer from "the significant and pervasive memory deficits he reported [to Dr. Boutwell] during clinical interviews."[4] [*Id.*, p. 10]

Based on the foregoing, Dr. Boutwell diagnosed Monroe with malingering.[5] As set out in the Competency report, malingering can be indicated by objective test results, marked discrepancies between reported and observed symptoms, and/or an inconsistent presentation based on the demands of the situation. [*Id.*, p. 12] Dr. Boutwell reported that the defendant exhibited all three of these indicators. Specifically, Dr. Boutwell opined that:

> First, test results overwhelmingly indicated [Monroe] was exaggerating all manner of psychological symptoms, to include severe neurological problems, low intelligence, problems with mood, and extreme and varied psychotic symptoms. Second, he reported severe and persistent memory deficits and deficits in his daily functioning that were simply not supported by objective evidence. He functioned adequately at this institution, and his phone conversations clearly indicated his ability to attend to conversations, remember information, engage in strategic planning and problem solving, and express his thoughts in a clear and coherent manner. Third, he displayed marked discrepancies in his functioning based on the context of the situation. For example, he displayed adequate functioning and memory when speaking with medical and unit staff, when engaging with other inmates, and during telephone conversations with his wife. In contrast, during every interaction with this evaluator, Mr. Monroe portrayed himself as grossly impaired and disabled. Thus, his behavior changed based on the context of the situation. The evidence is compelling that Mr. Monroe deliberately engaged in a gross exaggeration of cognitive and psychiatric symptoms. While definitive

---

4     Through these telephone conversations it is apparent that Mills actively participated and facilitated Monroe's attempt to manipulate the results of his competency evaluation and, in turn, these proceedings before the Court.

5     As noted in the Competency Report, malingering involves the intentional production of false or significantly exaggerated psychological or physical symptoms and that this behavior is motivated by some external incentive such as evading or mitigation criminal prosecution.

> diagnostic clarity remains impossible, what is clear is that Mr. Monroe does not appear to have a severe mental disease or defect.

[*Id.*]

Dr. Boutwell correctly applied the *Dusky* standard in determining that Monroe is competent. Beginning with whether the defendant suffered from a severe mental disease or defect, Dr. Boutwell concluded that Monroe has "no such mental disease or defect." [*Id.*, pp. 12-13] More specifically, she reported that "at no time did he display any symptoms to suggest the presence of an acute mental illness, to include psychotic or mood disorders." [*Id.*, p. 13] And, although the defendant "reported significant memory impairment, his report in this regard was not credible and is not supported by objective test results or collateral information. Therefore, no significant mental defect was present." [*Id.*]

Dr. Boutwell found compelling the contrast between Monroe's conversations and actions when dealing with evaluators (where he consistently maintained that he did not know basic personal information, much less information relating to these court proceedings) compared to his conversations and actions with Mills and in other settings. Dr. Boutwell reported that "during telephone calls he clearly understood his charges, and the fact he was being detained in a federal prison on those charges." [*Id.*, p. 12] Likewise, Monroe understood he was at the facility for a mental health evaluation and the potential impact of the evaluation on these proceedings. He "discussed deadlines associated with the evaluation process and legal proceedings" and mechanisms of how his case could be resolved such as a plea agreement. Monroe also "remembered information from one discussion to the next,

often spontaneously discussing various events that occurred in the days and weeks prior to the conversation." [*Id.*]

In conclusion, Dr. Boutwell recommended a finding of competency. [*Id.*, pp. 12-13] Specifically, Dr. Boutwell stated:

> While it is preferable to have some level of cooperation from the defendant n assessing the additional components of competency to stand trial, Mr. Monroe did not cooperate in such a capacity. Although not technically required, it is the preference of this evaluator to provide some information regarding the components of competency to stand trial even in the absence of a severe mental disease or defect. Such a stance is not possible in this case. As such, based on the fact Mr. Monroe does not appear to have a significant mental disease or defect, it is my opinion he is competent to proceed with his case. No major changes in his mental state are expected, and it is my opinion he does not currently have a significant mental disease or defect which would have an adverse impact on his ability to proceed with his legal case, to include sentencing.

[*Id.*, p. 13] In short, the Competency Report supports a finding that both prongs of the *Dusky* competency test appear to be met in this case, and its conclusions are well-supported.

Additionally, consistent with Dr. Boutwell's opinion, as delineated in the Competency Report and as expounded upon testimonially, the Court has not independently observed behavior that conflicts with the examiner's conclusions. At the time of the competency hearing, the defendant stayed seated but, as the hearing progressed, he began rocking or slightly swaying back-and-forth. However, this issue was addressed and AUSA Marye asked Dr. Boutwell if she had either ever observed or was aware of the defendant previously acting in that manner. Dr. Boutwell testified that Monroe had not done so during the duration of evaluation, but that there was another pretrial inmate that "does that very same thing." She

stated that Monroe was both housed near that inmate and that they were both at FMC-Lexington at the same time. The defendant's actions, accompanied by Dr. Boutwell's explanation, bolsters her diagnosis of malingering.

### B. Evidence Submitted by Monroe

Finally, as noted above, Monroe filed two reports into the record of this matter. These reports, however, do not support a finding of incompetency. As an initial matter, the Social Security psychological evaluations are from January and February 2006, and therefore are dated. Additionally, while the evaluator and author of those reports stated that the defendant fell within the range of "mild mental retardation," it was recommended that the defendant seek psychiatric treatment and a neurological examination. [Record No. 40-1, p. 9] Thus, not only were these Social Security psychological evaluations inconclusive, they provide no opinion or conclusions regarding the defendant's competency to stand trial.

The same holds true regarding the Cumberland CompCare reports provided by the defendant. Again, while the Cumberland CompCare report provides a preliminary diagnosis of post traumatic stress disorder, psychotic disorder, and anxiety disorder, the evaluator declined to reach a final determination pending a psychiatric evaluation by a psychiatrist. [Record No. 43-1, p. 21] Notably, Monroe never filed the final report from Cumberland CompCare, even though the Court granted him an extension of time to do so. These preliminary conclusions were also reached after only three visits between Monroe and the evaluator compared to intensive and thorough examination and evaluation the defendant underwent at FMC-Lexington over a period of seventy-four days.

Moreover, the Cumberland CompCare reports actually contain information that belies the defendant's claims of incompetency and further supports Dr. Boutwell's conclusions. For instance, the evaluators "assessment summary" states that Monroe informed her that he had previously been at FMC-Lexington for a psychological evaluation "due to his legal charges." The report indicates that the defendant informed the examiner that he was currently on probation for a cultivating marijuana charge and that Monroe "denied growing marijuana" and that "[the defendant] and wife say that he lives in a rural area of Kentucky and there are several areas where people grow marijuana but he is not guilty of this charge." [*Id.*, p. 17] Further, the report contains a notation from October 3, 2013, which states that the Cumberland CompCare evaluator "received a telephone call from [Monroe] on this date stating he goes to court on 10-07-13. He asked if therapist could write a letter for him to send to his lawyer his case . . . [h]e asked that the letter be faxed to his lawyer." [*Id.*, p. 22] Monroe then provided the ten digit fax number. [*Id.*] This information does not demonstrate indicia of incompetency but, instead, shows an understanding of the status of his case, the Court's role, and an ability to engage in this process toward a self-protective end.

In summary, the evidence provided by the defendant does not support his claim of incompetency and his reliance upon it is overstated. The Court agrees with Dr. Boutwell's conclusion that Monroe engaged in a significant degree of over-reporting of psychological symptoms and that he put forth a very poor effort on a number of cognitive tasks in a deliberate attempt to manipulate the results of the evaluation. The Court also agrees with Dr. Boutwell's conclusion that Monroe is not suffering from any acute psychosis or mood

disturbance. Rather, he is malingering and exaggerating all psychological symptoms. The defendant's self-reported memory deficits are not supported by the record. The Court finds no evidence which tends to show that Monroe is not competent. Further, he does not have a significant mental disease or defect that would adversely affect his ability to assist his attorney in this criminal action.

**IV.**

Based on the foregoing analysis and discussion, the Court **FINDS** and **CONCLUDES** that Defendant Leslie Monroe is competent to face further proceedings including trial. A scheduling conference will be set by separate Order.

This 14th day of February, 2014.



Signed By:
*Danny C. Reeves* DCR
United States District Judge